# IN THE COURT OF APPEALS OF IOWA

No. 24-0662
Filed December 3, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CHRISTOPHER WORTHAM ABRAM,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Melissa Anderson-Seeber, Judge.

        A criminal defendant appeals his conviction for willful injury causing serious injury and possession of a firearm as a felon.  **AFFIRMED.**

        Nathan Olson of Branstad & Olson Law Office, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Joshua Henry, Assistant Attorney General, for appellee.

        Considered without oral argument by Tabor, C.J., Buller, J., and Potterfield, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**POTTERFIELD, Senior Judge.**

Christopher Abram appeals his conviction for willful injury causing serious injury and possession of a firearm as a felon. Abram contends the district court abused its discretion in denying his motion for new trial on the basis that the verdicts were against the weight of the evidence. He additionally argues the district court abused its discretion in admitting a challenged exhibit for lack of sufficient foundation and in denying his motion to strike a juror for cause. Because the district court did not abuse its discretion, and Abram did not preserve error on his evidentiary challenge, we affirm.

## I.     Background Facts and Proceedings

On the afternoon of October 31, 2023, Police reported to South Street in Waterloo after receiving 911 reports of a shooting. One report was provided by Cameron Edwards, who had been driving down South Street at the time of the shooting. Edwards was driving in the direction of two men standing near the street who appeared to be "exchanging pleasantries," according to Michael Steiner, who was with Edwards in his vehicle. Edwards then "heard a loud pop," upon which the larger of the two men "fell off what . . . looked like . . . a hill or ledge." Later at trial, Edwards would testify that it appeared that this man had been shot. One caller reported that the larger man initially tried "walking up the street" but dropped to the ground, attempted to get up and walk again, and then dropped to the street again.

Surveillance footage from a "Ring" porch camera mounted on a nearby home confirmed that the victim was walking up the street when the smaller man approached him from across the street. The two exchanged words and the smaller

man fired at least three shots; the victim fell to the ground following the final audible shot. The victim then got up again and shuffled down the road until out of view of the surveillance camera. The other man immediately took off running following the final shot. At the time of trial, Edwards only remembered hearing one "pop", but Steiner testified to hearing "two or three" shots. Two other 911 callers reported hearing three gunshots. Although Edwards and Steiner witnessed the event, neither was close enough to see the shooter's face.

Law enforcement recovered two 9mm shell casings from the street. One casing was a Hornady-branded casing and the other was a TulAmmo-branded casing. One of the investigating detectives, Detective Kyle Jurgensen, opined that the shell casings were found in the street because the first two shots were fired from the sidewalk while the firearm's shell-ejection port was facing the street. The last shot was fired when the shooter was standing in the grass, and Detective Jurgensen presumed that law enforcement did not find the final shell because it was lying somewhere in the grass.

Detective Jurgensen later spoke with the victim, who emergency personnel had found with a gunshot wound in his torso shortly after the initial 911 calls. After being discharged from intensive care, the victim told the detective that Abram was the shooter and told Jurgensen 928 Lafayette Apartment 1 was Abram's address. Law enforcement executed a warrant at that address.

Abram was at the residence at the time of the search. A Tanfoglio FAB 92 semiautomatic handgun and two Springfield XD-S 9mm magazines were found in a bedroom on the first floor. That bedroom had the word "Terific" (sic) graffitied on the wall, which a police officer, the victim, and one of Abram's friends, Scott

Sorensen, identified as Abram's nickname. Sorenson later testified that Abram lived on the first floor by himself, and Abram testified that the bedroom was his but claimed "it's not solely my bedroom" without further explanation. The bedroom contained a court order from an unrelated case in which Abram was the defendant as well as pieces of mail addressed to Abram sent from a law firm and the Black Hawk County Jail. A Springfield XD-S 9mm handgun was recovered from the second floor of the home. A pair of shoes were also recovered and submitted as a physical exhibit which the jury could compare to what the shooter was wearing in the porch-camera footage.

A firearms expert from the Iowa Division of Criminal Investigations (DCI) compared the Tul Ammo and Hornady casings and found they had similar markings, which indicated they were fired out of the same weapon. The expert then compared the casings from rounds he test fired to the casings recovered at the scene. He found that the test-firing casings had markings resembling those on the TulAmmo and Hornady casings, indicating that the recovered FAB 92 was the weapon used on South Street. Additionally, Abram's DNA profile was obtained through a buccal swab, and that DNA profile matched the DNA profile swabbed from grip, trigger, and slide of the FAB 92. The DCI lab expert testified the DNA on the gun would have a one out of 1.2 nonillion chance of matching an unrelated individual.

The State charged Abram by trial information with one count of willful injury causing serious injury (count I) and two counts of possession of a firearm as a felon (count II relating to the FAB 92 and count III relating to the XD-S), with

habitual offender enhancements. Following jury trial, Abram was found guilty of counts I and II, and not guilty as to count III.

## II.      Error Preservation

As an initial matter, the State contests error preservation on Abram's claim that the district court abused its discretion "by admitting the Ring surveillance footage marked as State's Exhibit F without sufficient foundation." Under the Iowa Rules of Evidence, a party may only argue an evidentiary ruling was in error if that party "[s]tates the specific ground, unless it was apparent from the context." Iowa R. Evid. 5.103(a)(1)(b). When that ground is lack of foundation, a general foundation objection does not preserve error. *See Thompson v. Bohlken*, 312 N.W.2d 501, 509 (Iowa 1981) (holding that an objection failed to state "in what respect the foundation was lacking").

At trial, Abram's counsel objected to the admission of the Ring surveillance footage as State's Exhibit F, stating only "I don't think there's sufficient foundation" and "I have one more objection, which is relevance." Not only did defense counsel fail to describe the nature of his foundation objection, but his argument on appeal is so narrow that the specific ground could not have been apparent from the context of his initial objection. Abram now argues that "[f]ailure to have a records custodian from Ring lay foundation for Exhibit F should have led to the district court rejecting the exhibit." But Abram did not set forth any argument requesting a Ring representative testify to the exhibit's authenticity. Because Abram only set forth a general foundation objection at trial and never before presented the argument he now raises on appeal, error is not preserved for our review.

### III.     Standard of Review

The district court may grant a motion for new trial "[w]hen the verdict is contrary to law or . . . the weight of evidence."  Iowa R. Crim. P. 2.24(2)(b)(7).  We review denials of a motion for new trial on the weight of the evidence for an abuse of discretion and will only reverse "in the extraordinary case where the evidence preponderates heavily against the verdict."  *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

The district court possesses broad discretion when deciding motions to strike a juror for cause, and we thus review rulings on those motions for an abuse of discretion.  *State v. Jonas*, 904 N.W.2d 566, 570–71 (Iowa 2017).

### IV.     Discussion

#### a.  Motion to Strike Juror for Cause

Abram also argues the district court abused its discretion in denying his motion to strike Juror 266 for cause.

When considering motions to strike a juror for cause, the district court must consider "whether the juror holds such a fixed opinion on the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant."  *State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993) (citation omitted).  While we "generally review[] disqualification of jurors deferentially," our supreme court has held that a potential juror who "expresses bias or prejudice unequivocally" must be disqualified for cause notwithstanding subsequent assurances of fairness.  *Id.* at 571, 575 (finding an abuse of discretion where a juror "repeatedly expresse[d] actual bias" against the defendant's sexual orientation in both the pretrial questionnaire and in voir dire).

During jury selection, Juror 266 requested to have "a private conversation" about one of the potential witnesses for the State. Once away from the other jurors, Juror 266 claimed that one of the law enforcement witnesses had worked undercover, and thus, Juror 266 did not want to expose him in front of the other jurors. Juror 266 explained that he knows the witness and "knows his brother real well." The witness was a police officer who searched the home at 928 Lafayette and found the FAB 92 and XD-S magazines. The officer was expected to provide limited testimony related to the search and to identify the FAB 92 and magazine exhibits as the items he recovered at 928 Lafayette. When the prosecutor asked Juror 266 if that was "gonna cause any problems," the following interaction took place:

> JUROR 266: The only thing I can say is being a close friend, it's gonna be hard to go against him. That's just—if you're friends with someone, you'd probably think the same way. I'm just being honest.
> PROSECUTOR: And I guess if you do sit there as a juror, if you take an oath to follow the law—
> JUROR 266: Yeah.
> PROSECUTOR: —to listen to the instructions, to make a decision at the end of the case, would you be able to follow that?
> JUROR 266: I would think so.
>
> . . . .
> DEFENSE COUNSEL: You were talking about that you know [the police officer witness]—
> JUROR 266: Mm-hm.
> DEFENSE COUNSEL: —and having a long-lasting friendship. I guess, you were talking about him being—it being hard to go against him.
> JUROR 266: Well, just against a friend in general, not an officer of the law. Like, just in the sense of a friend, it's hard to go against something your friend's telling you, if that makes sense.
> DEFENSE COUNSEL: Yes, absolutely. And you can tell me if I'm right or wrong here, but would that go to stand to mean that you would be willing to give him the benefit of the doubt?
> JUROR 266: That's where I don't know because I haven't heard what he said or anything. But just being a friend, I know how

hard it is to go against a friend so that's the only thing I wanted to say. Not that I would purposely go with him, but it would be hard to against, so . . .

DEFENSE COUNSEL: Okay. So before hearing or seeing any of the evidence, you're—you would say that you would probably give him the benefit of the doubt?

JUROR 266: Possibly. I don't know that though for sure. I mean, I haven't heard any of the evidence, so . . .

DEFENSE COUNSEL: And if there was a jury instruction— you were instructed by the judge to follow the jury instruction—

JUROR 266: Correct.

DEFENSE COUNSEL: —would that keep you from giving him the benefit of the doubt?

JUROR 266: I don't know.

DEFENSE COUNSEL: Okay.

JUROR 266: I'm just being honest. I really don't know.

DEFENSE COUNSEL: And thank you for your honesty.

JUROR 266: Yeah. Like—it's not that I want to get off the jury, like, in that way, it's just being honest. I don't want to hurt someone else because of someone I know.

DEFENSE COUNSEL: And could you kind of expand on that last statement? Hurt someone else because of somebody I know.

JUROR 266: Well, if he's possibly innocent or possibly that, and I would side that. That's not gonna be a problem.

. . . .

PROSECUTOR: Is it possible that [the police officer witness] could make a mistake?

JUROR 266: Oh, everyone can for sure. We're human.

PROSECUTOR: As far as listening to the evidence, would you be able to judge the evidence using the Court's instructions?

JUROR 266: I would think so, yeah.

PROSECUTOR: I don't have any other questions.

DEFENSE COUNSEL: No further questions.

Following that line of questioning, Abram's counsel moved to strike Juror 266 for cause. The district court denied that motion and the parties went on to exercise their preemptive strikes. Abram did not use a peremptory strike on Juror 266, and Juror 266 went on to serve on the jury.

Here, even if we are to assume without deciding that denial of the motion to strike was an abuse of discretion, we find that Abram suffered no prejudice. For prejudice to be shown following the district court's wrongful denial of a motion to

strike a particular juror, "the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted." *Jonas,* 904 N.W.2d at 583. Abram's failure to request an additional peremptory strike forecloses any presumed prejudice and requires him to show actual prejudice. *See id.* And Abram cannot show prejudice under the *Neuendorf* test, which requires "some factual showing that" the district court's denial of the motion to strike for cause "resulted in a juror being seated who was not impartial." 509 N.W.2d 743, 746 (Iowa 1993).

The juror did not express unequivocal bias against Abram. Rather, the juror quite openly equivocated, expressing a desire to give Abram a fair trial and uncertainty over the effect, if any, his relationship with a witness would have on his decision-making as a juror. He notified the district court and attorneys of that concern and, by the end of his discussion with the court, agreed that he would "be able to judge the evidence using the Court's instructions" and admitted it was "possible that [the witness] could make a mistake." The juror gave no fixed opinion that he could not judge impartially. Thus, because the juror concluded he would be able to judge the evidence fairly, "[w]e believe it is too speculative to justify overturning the verdict of the jury" on the basis of the juror's relationship with the officer, especially considering the limited nature of the officer's testimony. *Id.*

### b. Weight of the Evidence

Abram contends that "the trial evidence weighs heavily against the verdict" because he "was never positively identified as the shooter and evidence was minimal." When considering a motion for new trial based on weight of the evidence, the district court may consider witness credibility, but it cannot grant the

motion if "more 'credible evidence' supports the verdict rendered than supports the alternative verdict." *State v. Ary,* 877 N.W.2d 686, 706 (Iowa 2016) (citation omitted). The district court "may invoke [this] power" in "extraordinary case[s]." *Id.* Because the district court is exercising its discretion in weighing this decision, we only review the district court's exercise of that discretion—we do not consider "the underlying question of whether the verdict is against the weight of the evidence." *Id.* at 707 (citation omitted).

Contrary to that standard of review, Abram focuses his argument on the evidence weighing in his favor rather than critiquing the district court's exercise of discretion. A court properly exercises its discretion in denying a motion for new trial when it "carefully weigh[s] the evidence, determine[s] credibility, and [gives] sufficient reasons for its decision." *State v. Reeves*, 670 N.W.2d 199, 209 (Iowa 2003). Here, the district court did exactly that.

First, Abram takes issue with the victim not having identified Abram as the shooter with certainty, testifying the shooter "kinda" looked like Abram. But the district court considered this, stating:

> [The victim] did testify that he had contact with Mr. Abram on that day. He testified he believed it was Mr. Abram, but he wasn't 100 percent. He also testified that he was only here because he was under subpoena. It was clear he didn't want to be here. He did not want to be testifying. The State's evidence in this case showed a video of the actual shooting occurring. The person with the gun in that video the jury could see and was approximately the same size as Mr. Abram. We know from the evidence that [the victim] was in fact shot.

And contrary to Abram's bold assertions that "no evidence ties [the bullet] casings to Abram" and "no evidence tie[s] [the FAB 92]" or the recovered

magazines to the shooting, the district court carefully considered the evidence supporting a conclusion otherwise:

> A handgun, specifically a Tanfoglio model FAB 92 9mm handgun, was found in the house. That information was sent to the [DCI] lab, and the State's Exhibit [T][1] shows that the cartridge casings at the scene matched the test-fired cartridges from this handgun. Further, the cartridge casings found at the scene were fired from the same firearm. Also, we had DNA evidence in this case where Mr. Abram's DNA profile was developed from a buccal swab and the DNA was developed from the firearm, the Tanfoglio 9mm handgun. They swabbed the grip, the trigger, and the slide as well as the magazine of the handgun. And concluded there was a statistical probability that it was a match to Mr. Abram's DNA and that is found in Exhibit R of the State's case. Based on the weight of the evidence in this case, I find that . . . the greater weight of the evidence, . . . there is credible evidence to support the jury verdict in this case. And, therefore, I will overrule the motion for a new trial.

Abram highlights the lack of witness identification, but the physical evidence against him was strong. And the district court expressly considered the credibility and motives of the victim, finally concluding that the evidence in favor of conviction outweighed the evidence against. The district court did not abuse its discretion in denying Abram's motion for new trial.

Because the district court did not abuse its discretion in denying Abram's motion for new trial or motion to strike a juror for cause, we affirm.

**AFFIRMED.**

---

[1] Exhibit T compares the casings found at the scene with the test-fired casings, but it appears the district court instead inadvertently referenced Exhibit F, which contained the Ring surveillance footage.